PETITIONER APPEARING PRO SE:
**ANDY YOUNG**
Wadsworth, IL

ATTORNEYS FOR RESPONDENT:
**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**REBEKAH P. DURHAM**
**JONATHAN D. ATWOOD**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

ANDY YOUNG, )
            Petitioner, )
            v. ) Cause No. 23T-TA-00001
DEPARTMENT OF LOCAL )
GOVERNMENT FINANCE )
            Respondent. )

FILED
Jun 14 2024, 2:19 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF LOCAL GOVERNMENT FINANCE

**FOR PUBLICATION**
**June 14, 2024**

ROBB, Special Judge.

Andy Young challenges the Indiana Department of Local Government Finance's (DLGF) final determination that the Lake County Assessor properly developed the county's 2022 land order.[1] Mr. Young does so on three bases: the timing of the

---

[1] "Land order" is not a statutory term, but an industry term used in this case to describe the process of determining neighborhood base rates in a county. It involves a statistical analysis of land sales and other factors to establish the value of unimproved parcels of land in a neighborhood. In this opinion the Court will use the terms "determination of land values" or "land

determination of land values; the process by which the land values were determined; and the accuracy of the base rates[2] in the land values determination. (*See* Oral Arg. Tr. at 4-5.) Mr. Young also contends that the DLGF failed to provide proper notice for the public hearing regarding the petition for review. The Court, having considered Mr. Young's arguments and reviewed the record, affirms the DLGF's final determination.

## FACTS AND PROCEDURAL HISTORY

Lake County taxpayer Andy Young timely submitted a petition pursuant to Indiana Code § 6-1.1-4-13.6 on behalf of 191 signatory taxpayers, to the DLGF on May 19, 2022, requesting a review of the 2022 Lake County determination of land values. (*See* Cert. Admin. R. at 2936.)

On August 10, 2022, the DLGF conducted a virtual public hearing regarding the petition for review of the Lake County land values determination. Mr. Young and taxpayer James Nowacki spoke against the DLGF approving the land values determination. Speaking on behalf of approving the land values determination were LaTonya Spearman, the Lake County Assessor; taxpayer Joslyn Kelly; and Edward Gholson of the Calumet Township Assessor's office. (*See* Cert. Admin. R. at 2961-3006.)

The DLGF allowed any person to submit written statements on the petition until August 19, 2022. Mr. Young, Mr. Nowacki, and Ms. Kelly submitted additional comments

---

values determination" instead of "land order."

[2] A "base rate" is the value of land established by an assessor to represent the typical and average characteristics of lots in a defined area. It is the starting point for an assessment of property in a neighborhood and may be combined with or adjusted by other factors to determine the assessed value of a parcel of land. A base rate is expressed as a dollar amount per unit of area (*e.g.*, per square foot, per acre, etc.). *See, e.g.,* REAL PROPERTY ASSESSMENT GUIDELINES FOR 2021 (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2(c) (2020)), Ch. 2.

in writing, while the Lake County Assessor and the Calumet Township and Ross Township Assessors submitted additional information both before and after the hearing. (*See* Cert. Admin. R. at 2938.)

On November 23, 2022, the DLGF issued a final determination approving the Lake County land values determination with no changes. (*See* Cert. Admin. R. at 2935-57.)

On January 3, 2023, Mr. Young filed this original tax appeal requesting the Court overturn the DLGF's final determination.

## STANDARD OF REVIEW

The party challenging the propriety of the DLGF's final determination bears the burden of demonstrating its invalidity. *City of Greenfield v. Indiana Dep't of Local Gov't Fin.*, 22 N.E.3d 887, 891 (Ind. Tax Ct. 2014). Accordingly, Mr. Young must demonstrate to the Court that the DLGF's final determination is arbitrary and capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. *Id.*

## DISCUSSION AND DECISION

### Timing - The Determination of Land Values Was Submitted Years Late

Mr. Young contends that the determination of land values under consideration is the 2018 land values determination for what he claims is the 2018-2021 quadrennial cycle. (*See* Pet'r Br. at 6.) (*See also* Oral Arg. Tr. at 5-8.) Mr. Young asserts that the determined land values should have been submitted no later than July 2017 so that they could have been in place by January 1, 2018, the beginning of the quadrennial cycle. (*See* Pet'r Br. at 6.) Adoption of the land values determination in early 2022, he argues, means that the land base rates were applied retroactively to the years in the

3

quadrennial cycle. (*See* Pet'r Br. at 32.)

However, that is not an accurate description of the reassessment cycle. The four-year period is not the time during which a particular determination of land values applies. Rather, it is the period during which at least one land values determination must be adopted.

Indiana Code § 6-1.1-4-4.2 governs the county reassessment plans, which must be submitted for approval by the DLGF. Relevant parts of the statute follow:

> (a)(3) Except as provided in subsection (b), the reassessment plan must divide all parcels of real property in the county into four (4) different groups of parcels. Each group of parcels must contain approximately twenty-five percent (25%) of the parcels within each class of real property in the county.
>
> (a)(4) Except as provided in subsection (b), all real property in each group of parcels shall be reassessed under the county's reassessment plan once during each four (4) year cycle.
>
> * * * * *
>
> (b) A county may submit a reassessment plan that provides for reassessing more than twenty-five percent (25%) of all parcels of real property in the county in a particular year. A plan may provide that all parcels are to be reassessed in one (1) year. However, a plan must cover a four (4) year period. All real property in each group of parcels shall be reassessed under the county's reassessment plan once during each reassessment cycle.

IND. CODE § 6-1.1-4-4.2(a)(3)-(4), (b) (2022).

The Lake County Assessor submitted a determination of land values at the Lake County Property Tax Assessment Board of Appeals ("PTABOA") meeting on June 27, 2018, the last year of that four-year cycle. (*See* Cert. Admin. R. at 2154.) The base rates in that land values determination were applied to taxes due in 2019, 2020, 2021 and 2022. The Lake County Assessor submitted a new determination of land values at the Lake County PTABOA meeting on April 6, 2022, again in the last year of that four-

4

year cycle. (*See* Cert. Admin. R. at 123-29.) The base rates in this land values determination will be applied to taxes due in 2023 and subsequent years until the year after the next determination of land values is adopted. The next land values determination must be adopted no later than 2026, though it may be prepared at any time within the reassessment cycle.

Mr. Young has not provided evidence, nor does the record indicate, that the Assessor submitted the 2018 determination of land values years late in 2022. The Court, therefore, denies this claim.

### Process - The Wrong Assessor Developed the Land Base Rates

Mr. Young argues that the process for determination of the land values was contrary to law because "the Calumet Township Assessor had been providing the base rates to the Lake County Assessor, instead of vice versa as is required by law." (Pet'r Br. at 31.) (*See also* Oral Arg. Tr. at 8; Cert. Admin. R. at 2971.) The relevant statutory language in question follows:

> (a) The county assessor shall determine the values of all classes of commercial, industrial, and residential land (including farm homesites) in the county using guidelines determined by the department of local government finance. The assessor determining the values of land shall submit the values to the county property tax assessment board of appeals by the dates specified in the county's reassessment plan under section 4.2 of this chapter.

IND. CODE § 6-1.1-4-13.6(a) (2022) (amended 2023).

Lake County's assessment process and its relationship to township assessors is largely unique. Under Indiana Code § 36-6-5-1(d), a township assessor will continue to be elected in each township where, as of January 1, 2008, there were at least 15,000 parcels of real property and the transfer of the assessment duties to the county

assessor was disapproved in the 2008 referendum under Indiana Code § 36-2-15. *See* IND. CODE § 36-6-5-1(d) (2022). In those situations, the township assessor shall perform the assessment duties prescribed in Indiana Code § 6-1.1. *See* IND. CODE § 36-6-5-3(a) (2022).

Referenda on the elimination of township assessors were held throughout the state in 2008. Around 950 township assessors were eliminated, but the position of township assessor was retained in 13 townships, including Calumet Township. Notably, five of the 13 townships retaining the position of assessor are in Lake County.[3]

The Calumet Township Assessor provided the Lake County Assessor with the determined land values for submission to the PTABOA. The process followed in the instant case is proper because the Calumet Township Assessor is specifically empowered by statute to perform the assessment duties.

### Accuracy – Land Base Rates Are Inaccurate and Inconsistent

Mr. Young contends that land base rates in Lake County are inaccurate. He expressed particular concern that the base rates of small lots in Calumet Township were "completely inconsistent and not uniform." (*See* Cert. Admin. R. at 2978-79.) He notes that "you may find another lot identical by any metric to be the same, yet it might have a[n] assessed value of three or four times the other one. They're maybe a rock's throw

---

[3] A list of the 13 townships retaining the assessor position can be found in the Fiscal Notes prepared by the Legislative Services Agency for House Bill 1027 of 2020 and House Bill 1262 of 2021. *See* OFF. OF FISCAL & MGMT. ANALYSIS, INDIANA LEGIS. SERVS. AGENCY, FISCAL IMPACT STATEMENT H.B. 1027 (Jan. 14, 2020), available at https://iga.in.gov/pdf-documents/121/2020/house/bills/HB1027/fiscal-notes/HB1027.02.COMH.FN003.pdf (last visited June 14, 2024); OFF. OF FISCAL & MGMT. ANALYSIS, INDIANA LEGIS. SERVS. AGENCY, FISCAL IMPACT STATEMENT H.B. 1262 (Dec. 9, 2020), available at https://iga.in.gov/pdf-documents/122/2021/house/bills/HB1262/fiscal-notes/HB1262.01.INTR.FN001.pdf (last visited June 14, 2024).

of one another." (Cert. Admin. R. at 2979.) He further asserts that "identical neighborhoods, side by side with indistinguishable characteristics, should have uniform base rates." (Oral Arg. Tr. at 11.)

Assessors are required to submit a ratio study of assessments across neighborhoods to the DLGF each year. *See* IND. CODE § 6-1.1-14-12 (2022). The DLGF reviews the ratio studies to ensure "that values are equalized across properties." (*See* Cert. Admin. R. at 2950-51.) As part of its review of the determination of land values pursuant to Indiana Code § 6-1.1-4-13.6, the DLGF "re-checked and cross-checked ratio studies for each of the three years prior to 2022, and 2022." (*See* Cert. Admin. R. at 2951.) It also "reviewed a long list of a sample of properties in detail to cross check its work on the ratio studies." (*See* Cert. Admin. R. at 2951.) After extensive review by its staff, the DLGF found no reason to deny or change the land values and ordered no change to the land values determination. (*See* Cert. Admin. R. at 2954-55, 2957.)

In support of his contention that vacant lots in Calumet Township are routinely overassessed, Mr. Young refers to a study conducted in coordination with a group from Indiana University Northwest regarding small vacant lots in Gary known as churners. It:

> was a literal study in the unmarketability of these churners. Despite the study's conclusions that these properties had little or no marketability, even though the Lake County Assessor was closely involved as is indicated in the reports, no assessing official ever considered reducing the assessments of the subject parcels to comport with the study's findings.

(Pet'r Br. at 25.)

The DLGF reviewed the study and argues that:

> [t]he study deals with tax lien sales, which are for properties where the owner is not paying property tax. Up for sale is not the property itself, but the lien on the property, leaving the buyer to pursue the

7

debt of unpaid tax. Thus it is not precisely that the property itself is unmarketable, but instead that the debt incurred by landowners who refuse to pay property tax is unmarketable.

(*See* Resp't Br. Opp'n Pet. ("Resp't Br.") at 14-15 (citing Cert. Admin. R. at 2772, 2775).)

The Court notes that the study is titled *Analysis of the Tax Sale Certificates not purchased at a Lake County Commissioners' Tax Certificate Sale.* (*See* Cert. Admin. R. at 2765.) The fact that there are many properties in Calumet Township that do not find buyers at tax sales may reflect on the general economic conditions of parts of the township. However, it does not mean that vacant lots in similar neighborhoods unencumbered by tax liens should have their assessments lowered to reflect the unmarketability of similar encumbered properties.

Mr. Young next argues that the DLGF did not perform a proper review of the land values determination since it spent only 100 hours on the review. (Pet'r Br. at 29.) He opines "that a thorough review of the materials that were used to support the construction of the Lake County Land Order would require a minimum of 1,000 hours. In addition, a practical review should have also required field visits to Lake County." (Pet'r Br. at 30.) The DLGF responds that "the DLGF as a reviewing authority is not required to re-do the entirety of the work that the assessors completed during the reassessment cycle and the land order development process. This would be an extraordinary bureaucratic inefficiency and a waste of taxpayer money." (Resp't Br. at 15.)

The legislature has not provided any guidance on how the DLGF should conduct the review. Indiana Code § 6-1.1-4-13.6(e) merely states:

Upon receipt of a petition for review under subsection (d), the department of local government finance:

8

> (1) shall review the land values determined by the county assessor; and
>
> (2) after a public hearing, shall:
>
>> (A) approve;
>>
>> (B) modify; or
>>
>> (C) disapprove;
>
> the land values.

I.C. § 6-1.1-4-13.6(e).

The DLGF has reviewed the land values determination using statistical and other tools through which it normally provides oversight of the assessment process. But it has done so with a more thorough reexamination of the original data and additional data provided by the assessors and the petitioners. The DLGF's review of the 2022 land values determination appears proper, and the Court has neither the authority under the statute nor the technical knowledge of the assessment review process to impose on the DLGF a requirement for an even more thorough review.

At the administrative hearing, Mr. Nowacki testified that the former Lake County Assessor hired an independent appraiser in January 2018 to appraise three randomly chosen properties in Calumet Township and compare them to the assessed values. (*See* Cert. Admin. R. at 2987-90.) The results indicated that the properties were assessed by multiples over the appraised values. (*See* Cert. Admin. R. at 2987-90.) Mr. Young, through his testimony and submissions, has provided anecdotal information regarding inconsistencies in the assessed values of properties in Calumet Township. However, Mr. Young has not provided the Court with any evidence, statistical or

9

otherwise, to justify overturning the DLGF's judgment on review of the determination of land values.

## Insufficient Notice of Public Hearing

Mr. Young next contends that the DLGF did not provide proper notice of the petition hearing resulting in only Mr. Nowacki and him making statements against approval of the determination of land values. (*See* Pet'r Br at 10.) (*See also* Oral Arg. Tr. at 29.) Mr. Young states in his brief that:

> [DLGF] sent many notices to addresses that were not the addresses of record for the property addresses on the Petition. Many of the notice letters sent by the DLGF in advance of the public hearing went to empty lots[] or addresses that were not where the taxpayers receive their tax bills. Had the Petitioners known this was the form of notice the DLGF had in mind we would have formatted the Petition differently. Had notice been proper, it is likely more individuals would have participated in the public hearing. The DLGF's notice was improper and insufficient. Notice should have been sent by mail to each and every taxpayer in the county at their address of record.

(Pet'r Br. at 10.)

The DLGF contends that it "went above and beyond its duty by mailing notice to each person who signed the petition. It also posted information about the hearing on the DLGF website by July 15, almost a month in advance of the hearing, making the hearing accessible to any interested individual who wished to attend or testify, regardless of whether they signed the petition." (Resp't Br. at 17.) (*See also* Cert. Admin. R. at 70-71.) The DLGF also notes that it is not statutorily required to provide notice and that mailing notice to every Lake County taxpayer "would be a costly and wasteful use of the State's limited resources." (*See* Resp't Br. at 16-17.) *See* also I.C. § 6-1.1-4-13.6(e)(2).

At oral argument, the Court asked Mr. Young if he could provide any statutory authority regarding notice requirements for the petition for review public hearing, and Mr. Young was not able to do so. (*See* Oral Arg. Tr. at 29-30.) The statutory language in fact does not mention notice.

> Upon receipt of a petition for review under subsection (d), the department of local government finance:
>
> (1) shall review the land values determined by the county assessor; and
>
> (2) after a public hearing, shall:
>
> (A) approve;
>
> (B) modify; or
>
> (C) disapprove;
>
> the land values.

I.C. § 6-1.1-4-13.6(e).

"The best evidence of [the Legislature's] intent is a statute's text." *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). The Indiana General Assembly has provided specific public hearing notice requirements in multiple places throughout Indiana Code's Article 6-1.1,[4] and here it has not done so. Mr. Young's suggestion that notice of the public hearing be sent to the addresses where the petition signers receive their tax bills instead of the property addresses may be a good one. Mailing notice to all Lake County

---

[4] *See, e.g.*, IND. CODE § 6-1.1-14-9 (2024) (notice of public hearing for consideration of an increase in county assessments); IND. CODE § 6-1.1-17-16.1 (2024) (notice of public hearing for DLGF review of political subdivision budget, tax rates and tax levies); IND. CODE § 6-1.1-17-20.4 (2024) (notice of public hearing on review of proposed budget and levy of public libraries with excessive cash balance of funds derived from tax revenue); IND. CODE § 6-1.1-39-3 (2024) (notice of public hearing on creation of economic development districts); IND. CODE § 6-1.1-48-14 (2024) (notice of public hearing on creation of urban agricultural zones); and IND. CODE § 6-1.1-50-4 (2024) (notice of public hearing on county option property tax relief for homesteads).

taxpayers may be less sound. Regardless of the merits or demerits of Mr. Young's public hearing notice suggestions, the DLGF has made reasonable efforts to provide public notice despite the legislature providing no notice requirement, and the Court will not create its own specific notice requirement. That is a matter for the legislature.

## CONCLUSION

Mr. Young has not demonstrated to the Court that the DLGF's final determination is arbitrary and capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. Accordingly, the Court AFFIRMS the DLGF's final determination.